UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

David WEINTRAUB

Plaintiff,

-against-

BOARD OF EDUCATION OF THE CITY
OF NEW YORK, COMMUNITY SCHOOL          MEMORANDUM AND ORDER
DISTRICT NO. 32, Lawrence BECKER,            00-CV-4384 (ILG)
Jerry CIOFFI, Dawn FELDER, Jamin
FELDER, Douglas GOODMAN, Daisy
O'GORMAN, Felix VAZQUEZ, Frank
MILLER, Aida SERRANO,

Defendant,

-------------------------------------------------x

GLASSER, United States Senior District Judge

# **INTRODUCTION**

Plaintiff, David Weintraub ("Weintraub" or "plaintiff"), brings claims against

defendants for retaliatory adverse employment action in violation of his First

Amendment rights; false arrest and malicious prosecution in violation of state law, the

Fourth Amendment of the Constitution, and 42 U.S.C. § 1983; and deprivation of his

property and liberty in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.[1]

The claims arise out of a series of events that took place when plaintiff was employed by

the New York City Department of Education.  Named as defendants are the Board of

Education of the City School District of the City of New York (the "Board"); Community

---

[1]  Plaintiff's Second Cause of Action generically alleged defendants violated 42 U.S.C. § 1983 in
lodging a complaint of sexual abuse against him, but failed to identify any constitutional infringement.
This issue was raised by defendants in their motion for summary judgment, and plaintiff has not
responded to the argument.  The claim is therefore dismissed for failure to state a claim.  See Chapman v.
Houston Welfare Rights Organization, 441 U.S. 600, 617 (1979) ("[O]ne cannot go into court and claim a
'violation of § 1983' – for § 1983 by itself does not protect anyone against anything.").

1

School District No. 32 (the "District"); Douglas Goodman, ("Goodman"), Assistant Principal of P.S. 274; Daisy O'Gorman ("O'Gorman"), the Principal of P.S. 274; Felix Vazquez ("Vazquez"), the Superintendent of Community School District No. 32; Frank Miller, ("Miller"), a New York Police Department school security officer at P.S. 274; Aida Serrano, ("Serrano"), a teacher at P.S. 274; Dawn Felder, the mother of a student at P.S. 274; Jamin Felder, a student at P.S. 274; Lawrence Becker ("Becker"), Chief Administrator for the Division of Personnel Investigations of the Board; and Jerry Cioffi ("Cioffi"), Deputy Superintendent of the Chancellor's District of the Board.

Before the Court is defendants' motion for summary judgment on all claims, pursuant to Fed. R. Civ. Proc. 56.

## FACTS

### I.   Plaintiff's Initial Conflict With Goodman

In September, 1998, Weintraub began teaching fifth grade at PS 274 in Brooklyn. (56.1, ¶ 1).  During his first few months at PS 274, Weintraub's relationship with administrators at PS 274 was unremarkable; he neither complained about anything out of the ordinary at the school, nor did he hear anything negative about his performance. (Pl. Ex. 11 at 49).

On Friday, November 6, 1998, Weintraub referred a student to Goodman for disciplinary action after that student threw a book at Weintraub in the classroom.  The student returned to Weintraub's classroom shortly thereafter. (56.1, ¶ 1).  That same student again threw books at Weintraub on Monday, November 9, 1998.  Again Weintraub referred the student to Goodman, and again Goodman returned the student to Weintraub's class shortly thereafter.  (56.1, ¶ 3).

2

In deposition testimony, Weintraub stated:

> I was upset because a child was throwing books and I was upset that
> nothing was done about it.  And I was upset that if this child could do this
> to me, that it would put the danger of  [sic] other students at risk and,
> unfortunately . . . he put a kid in the hospital later in the year."

(Def. Ex. A at 51).

Weintraub states that he told Goodman that "[i]f nothing is going to be done

about this, I will have to file a grievance because it is not an environment a teacher

would want to go to where a child is allowed to throw a book at teachers." (Ex. A. at 47).

Weintraub told other teachers at the school about the incident and his intention to file a

grievance, and filed that grievance through his union representative.  (56.1, ¶ 4).

Weintraub alleges that these complaints precipitated a series of retaliatory actions

against him that were orchestrated by Goodman and other school officials. (Pl. Ex. 11 at

53-54).

## II.    The Breakfast Incident

On November 17, 1998, at 8:45 a.m., Weintraub wrote a ten-minute breakfast

pass for a girl who said she had been accidentally locked out of school breakfast by

security.  Goodman immediately sent the child back to the classroom.  Later that day,

according to Weintraub, Goodman confronted him in a "snide, condescending voice,"

questioning his judgment and "yell[ing] at [him] . . . not to do that again." (Pl. Ex.  53).

On November 30, 1998, Weintraub sent a letter to O'Gorman suggesting that

Goodman's remarks were part of "a larger pattern of acts of intimidation, harassment,

workplace abuse, and deliberate attempts to undermine [his] authority, which impairs

[Weintraub's] ability to provide [his] student's [sic] with the education they deserve,"

3

and requested that she investigate the incident. (Id.).  O'Gorman responded the next

day, stating that she also believed that the breakfast pass was inappropriate and noting

that Goodman "denies [the allegations of harassment] and indicates you are making

these allegations because he has expressed his concern to you over the fact that every

time he visits your classroom you are yelling at your students because you cannot

control the class." (Pl. Ex. 54).

### III.    Allegations of Corporal Punishment

On November 19, 1998 Goodman wrote a letter to Weintraub and Weintraub's

personnel file, in which Goodman alleged that students had complained Weintraub was

using corporal punishment in the classroom.  Goodman instructed him to "improve

[his] classroom management." (Pl. Ex. 2).  Though the investigation and reporting of

corporal punishment was generally handled by the school guidance counselor, (Pl. Ex.

75 at 53), Goodman personally filled out the required report documenting these

allegations and submitted it to the Board of Education, Office of Special Investigation.

(Pl. Ex. 3).

The allegations were deemed unfounded in January 1999, and Goodman was

"directed to inform Mr. Weintraub by the Central Board in writing that he was not guilty

of corporal punishment."  (Pl. Ex. 7).  To do so, he placed a letter in Weintraub's

personnel file that stated, in part, "[o]ur investigations found that although there was no

corporal punishment on your part, you did use poor judgement in the way you handled

the situation with [the student].  In the future you must show more restraint in handling

confrontational situations." (Pl. Ex. 5).  Weintraub grieved this letter, particularly the

allegation that he used poor judgment.  O'Gorman met with Weintraub and a union

representative on January 27, 1999 before denying the grievance on February 2, 1999.
(Pl. Ex. 6).  Weintraub filed for a Step II hearing, where, on February 24, 1999, the
hearing officer sustained the grievance and ordered the letter removed from
Weintraub's file.  (Pl. Ex. 6, 7).  At the Step II hearing, Goodman stated that "[he] was
directed to inform Mr. Weintraub by the Central Board in writing that he was not guilty
of corporal punishment. [He] decided to have it placed in his file so that it would be
clear that [he] followed their directive. [He] did not know [he] could have given him this
letter without it being placed on his file." (Pl. Ex. 7).

## IV.    O'Gorman and Goodman's Classroom Evaluations of Weintraub

### A.    O'Gorman's observation of Weintraub

On November 19, 1998, O'Gorman placed a letter in Weintraub's personnel file
regarding "pedagogical inadequacies" and threatening an unsatisfactory evaluation if
Weintraub's practices didn't improve.  (Pl. Ex. 32, 33).  O'Gorman stated that she
"visited [Weintraub's] classroom and observed its floor covered with garbage indicating
[his] failure to maintain proper student discipline and classroom management."  (Pl. Ex.
32).  The letter also said that O'Gorman had "informally observed [Weintraub's]
classroom and found that students are always talking to one another and that students
are out of their seats whenever [she] visit[ed]," and alluded to "several parents" who
"have visited [her] office demanding [Weintraub's] removal after arguing to [her] that
their children are not learning anything in [Weintraub's] classroom."  (Id.).

Weintraub grieved this letter.  The grievance was ultimately arbitrated, and the
arbitrator determined that "the November 19, 1998 Observation Report . . . from Ms.
O'Gorman [was] unfair."  The arbitrator ordered the deletion of most of the letter placed

in Weintraub's file.  (Pl. Ex. 13).  Rather than delete the unfair portion of the letter, thin

lines were drawn through the offensive material. (Pl. Ex. 35).

### B.      Goodman's observation of Weintraub

On December 7, 1998, Goodman observed Weintraub's class and filed a formal

observation report.  (Pl. Ex. 36).  Goodman's report contains both positive and critical

statements regarding the classroom environment and lesson that he observed, but

concludes overall that "[t]he reading lesson I observed was unsatisfactory."  (Id.).

Weintraub challenged this conclusion.  At the Step II grievance hearing that was

held on January 26, 1999, the hearing officer sustained Weintraub's grievance, stating

that "[t]his observation report as written does not warrant an overall unsatisfactory

rating." (Pl. Ex. 37).

### C.      O'Gorman's year-end evaluation of Weintraub for 1998-99

Based on the single classroom evaluation that had been conducted by Goodman

in November 1998, O'Gorman produced two conflicting year-end evaluations in June of

1999.  On the first evaluation, received by Weintraub on June 14, 1999, O'Gorman rated

Weintraub unsatisfactorily in 18 of 23 categories and recommended denial of

certification of completion of probation.[2] (Pl. Ex. 50).  O'Gorman gave a copy of that

evaluation to Weintraub, but district Superintendent Vazquez never adopted that

evaluation as required by school policy.  (Id.).  Instead, a week later, O'Gorman

delivered to Weintraub a revised evaluation, this time rating him unsatisfactorily on

---

[2]  The "denial of certification of completion of probation" would have revoked Weintraub's license
to teach anywhere for the New York City Public Schools.  The less severe recommendation of
"discontinuation of probationary service," only discontinues a recipient's service in the particular school
district, without preventing him from obtaining a position elsewhere in the New York City public schools.
(Pl. Ex. 42 at 53-54).

only 6 of 23 categories and recommending only the discontinuation of probationary service.  (Pl. Ex. 51).  This evaluation was adopted by Vazquez.  (Id.).  Vazquez did not recall in his deposition whether he had seen the earlier version of the review.  (Pl. Ex. 42 at 52-53).

A year later, in June of 2000, an independent "Chancellor's committee" reviewed O'Gorman's evaluation of Weintraub and observed "the complete lack of any evidence or documentation" to support the unsatisfactory ratings and recommendation of discontinuation, and "unanimous[ly] nonconcurr[ed] with the recommendation to discontinue probationary service." (Pl. Ex. 52.)

**V.     Allegations of Sexual Abuse**

On January 8, 1999, Goodman reported to the Special Commissioner of Investigation for the New York City School District that a former student of Weintraub's, Jamin Felder, had informed his mother, Dawn Felder, that Weintraub had sodomized him.  (Pl. Ex. 55).  According to the filed report, Goodman had been informed of the complaint by the school guidance counselor, Ms. Lauria.  Goodman further stated that the student had previously complained in October 1998 that Weintraub had "flirted" with him, though Goodman did not report the previous incident, because at the time Goodman found no corroboration of the student's allegations.  (Id.).  As a result of this report, Weintraub was immediately reassigned to duty in the nurses's office at PS 274, and subsequently transferred on January 21, 1999 to work at district Superintendent Vazquez's office for the rest of the school year while the charges were investigated.  (Pl. Ex. 19 at 82, 41, 42 at 21).

Lauria, the guidance counselor, testified in her deposition that she recalls Felder

7

making graphic allegations that a teacher sodomized him, but does not recall that Felder identified Weintraub as the assailant, and recalls neither discussing these allegations of abuse with Goodman nor any earlier allegations of flirtation made by Felder against Weintraub.  She further stated that she would generally discuss such serious allegations with the principal, not the assistant principal.  (Pl. Ex. 75 at 32-35).

Investigators interviewed Felder several times.  They found that he "was not consistent in relating the facts," and in the absence of any evidence or witnesses, closed the investigation.  (Pl. Ex. 55).

Though plaintiff was cleared of any wrongdoing by the investigators, and though defendant Vazquez, the district Superintendent, was notified that the investigation had been closed sometime near the end of the 1998-1999 school year, there is no record of Vazquez or any other administrator notifying Weintraub of the investigation's outcome, nor was Weintraub returned to the classroom.  (Pl. Ex. 42 at 24-25, 43).

**VI.    Allegations of Abandonment**

On January 11, 1999, prior to Weintraub's transfer to the district office as a result of the sexual abuse allegations, Goodman placed a letter in Weintraub's personnel file alleging that Weintraub "[o]n two occasions last week abandoned [his] class." (Pl. Ex. 8).  Goodman stated in the letter that "[o]n Thursday, 1/7/99 I was in the process of observing Ms. Chess.  Your class came down unescorted."  And on January 8, 1999, Goodman also "observed [Weintraub's] class walking toward Ms. Serrano's room," again, without Weintraub present. (Id.).

Goodman's letter was accompanied by two letters from the named teachers, Ms. Chess and Serrano.  The letter from Chess stated that she didn't see Weintraub when his

8

class was brought to her room on January 7, 1999. The letter from Serrano stated that on January 8, 1999, Weintraub did not bring his students directly to her class but "stood on the other side of the swinging doors," while the students filed in, and that four students did not arrive at her class.  (Pl. Ex. 9, 10).  Weintraub denies that the event with Serrano ever happened.  (Def. Ex. B at 49-50).  At least one teacher offered a letter stating that Weintraub did not abandon his class on January 8, 1999. (Pl. Ex. 12).

Weintraub contested the letters placed in his file.  At the Step II hearing held on February 24, 1999, he  stated that the letters from Goodman, Chess, and Serrano were inaccurate "because [he] did not abandon [his] class.  On the two dates in question [he] did make sure [his students] got to their classes.  They were in sight at all times." (Pl. Ex. 34).  Goodman reiterated his position from the letter and read a dictionary definition of "abandonment" into the record.  The hearing officer found it "clear" that Weintraub did not abandon his class, but also that he did not properly escort his class, in violation of school rules and procedures.  The grievance was denied, but the hearing officer ordered the letter to his personnel file to be "re-written deleting all sentences that have the words abandoned or abandonment in them." (Pl. Ex. 34).

## VII.   Allegations of Assault

On June 25, 1999, Weintraub and Serrano encountered each other in the vicinity of a bodega off school grounds, but near P.S. 274 and the district office to which Weintraub had been reassigned.  (56.1, ¶ 7).  Though both parties acknowledge their presence at the location that day, the details of the encounter are sharply disputed. Serrano claims that as Weintraub passed her on the sidewalk, he stabbed her in the back with a pencil and said  "Now you know how it feels to be stabbed in the back," though

she also states that Weintraub would have had no motive to have done such a thing or made such a statement.  (<u>Def. Ex.</u> D at 37, 33).

Plaintiff claims that he passed by Serrano on the sidewalk, and when he had passed, at a distance of 20-25 feet, Serrano inexplicably started screaming at him "You hit me . . . You f-ing hit me," to which he replied "What are you f-ing talking about?" and then entered the bodega to purchase lunch (<u>Pl. Ex.</u> 11 at 93-94).  When he came out of the store a few minutes later, Weintraub stated that Serrano was still on the corner and continued to yell at him, so he crossed the street and returned to his office.  (<u>Def. Ex.</u> B at 97).  At his deposition, Weintraub denied that there was ever any physical contact between the parties or that he ever made a statement about stabbing Serrano in the back.  (<u>Def. Ex.</u> B at 96).

Serrano stated in her deposition that she returned to the school and informed O'Gorman and Goodman about the event.  (<u>Def. Ex.</u> D at 38-39).  Goodman summoned Miller, who recorded in his logbook that Goodman then called 911.  (<u>Def. Ex.</u> F at 19-20).  Serrano described the events and her alleged injury to the NYPD officers and Miller, (<u>Def. Ex.</u> D at 40-41), and told the officers that she wanted Weintraub arrested and emergency medical services  ("EMS") attention.  (<u>Def. Ex.</u> D at 42, <u>Def. Ex.</u> E at 22-23).  After the police officers left, EMS responded.  (<u>Def. Ex.</u> E at 23).  In her deposition, Serrano stated that she was examined by the EMS technician, who indicated a welt on Serrano's back, and broken skin, but no bleeding.  Serrano received no medical treatment for the alleged injury.  (<u>Def. Ex.</u> E at 42).

Miller recalls that after Serrano described the allegations for him and the other NYPD officers, but before EMS responded, he and the other officers left O'Gorman's

office and the NYPD sergeant asked Miller if Weintraub should be arrested. (Def. Ex. E at 24, 27). Miller responded affirmatively, and the sergeant asked Miller if Miller wanted the arrest. Again Miller said yes. (Def. Ex. E at 24).

Whether Serrano accompanied the officers to arrest Weintraub is disputed; she denies accompanying the officer, but the NYPD sergeant recalls that she went with them. (Compare Def. Ex. D at 43 with Pl. Ex. at 33). At least Goodman and Miller went across the street with NYPD officers. Goodman summoned Weintraub from his office, and the police asked Weintraub if he knew why they were there. Weintraub responded negatively, stating that "[he] didn't know what [they were] talking about." (56.1, ¶¶ 13-15, Pl. Ex. 25). Miller later adopted a statement that in making the arrest, he was not only informed by Serrano's complaint, but that he was "further informed by [Weintraub's] own admissions that [he] stabbed informant about the back with [a] pencil." (Pl. Ex. 24, 25). There is no evidence of any such admission by Weintraub in the record.

Miller arrested the plaintiff, transported him to central booking, where he was charged with misdemeanor attempted assault, a harassment violation, and misdemeanor possession of a weapon. (56.1, ¶ 15; Pl. Ex. 24, 29). Serrano went to the precinct with other officers and signed an information/complaint against Weintraub. (Def. Ex. D at 46). Ultimately, in December of 1999, the charges were dismissed and the record sealed. (Pl. Ex. 14).

## VIII. Weintraub's Transfer and Termination From School District 32

On July 1, 1999, as a result of the arrest, Vazquez received a recommendation from an administrator in the Office of Personnel Investigations to "reassign Weintraub

11

to a location where [he] will neither be in the vicinity or have any contact with students."
(Pl. Ex. 57).  Vazquez testified that it was the policy of the Board not to terminate
teachers for having been charged with a misdemeanor, but to await disposition of case
to make a determination.  (Pl. Ex. 42 at 122-123).  Nonetheless, a handwritten memo
indicates Vazquez's intention to conduct a Technical Assistance Conference ("TAC") in
Weintraub's case, a requisite step to terminating Weintraub's probationary license to
serve within the New York City public schools.  (Pl. Ex. 52, 56).  Without conducting a
TAC, a probationary employee whose services are discontinued from one district would
be eligible to serve in any other school that consents to employ him. (Pl. Ex. 56).
Vazquez's testimony does not indicate that a TAC was actually held in Weintraub's case
and there is no record that one was ever held.  (Pl. Ex. 72).

On July 19, 1999, Weintraub was terminated from employment in Community
School District 32 by Superintendent Vazquez without any stated reason.  (Pl. Ex. 59, 42
at 43).  Vazquez later testified that Weintraub "was terminated for poor performance as
a teacher.  The arrest is another issue." (Pl. Ex. 42 at 79).

## IX.   Weintraub's Termination from the Chancellor's District

Despite being terminated from School District 32, Weintraub retained his
probationary license and later that summer, obtained a position at Public School 85 in
the Chancellor's District in the Bronx.  (Pl. Ex. 61, ¶ 5).[3]  He began teaching there on
September 7, 1999.

On September 25, 1999, Weintraub filed a notice of claim for false imprisonment

---

[3]  "The Chancellor's District is a group of schools that have been placed under the direct
jurisdiction of the Chancellor of the Board of Education in an effort to improve educational achievement in
these particular schools."  (Pl. Ex. 61, ¶ 2).

against the City in New York Supreme Court.  (Pl. Ex. 65).

On October 1, 1999, defendant Deputy Superintendent of the Chancellor's
District Jerry Cioffi was informed of the charges stemming from Weintraub's prior
arrest.  Cioffi conferred with defendant Lawrence Becker, Chief Administrator for the
Division of Personnel Investigations, and they terminated Weintraub pending resolution
of the outstanding unresolved arrest. (Pl. Ex. 61, ¶¶ 6, 11).  At the time he terminated
Weintraub, Cioffi "understood that [Weintraub's arrest] was an arrest for some sort of
serious charge" from his conversation with Becker.  (Pl. Ex. 64 at 20).  By affidavit,
Cioffi testified that "[his] decision to terminate petitioner's service had nothing to do
with the [lawsuit Weintraub had filed], and solely with respect to petitioner's
outstanding and unresolved arrest. [sic]."  Local administrators at Public School 85
indicated to Cioffi that if Weintraub was cleared, they would take him back.  (Pl. Ex. 63
at 41-42).

On November 5, 1999, The New York State Department of Labor determined that
plaintiff was "discharged for misconduct in connection with [his] employment" and
denied his application for unemployment benefits.  The reason given for the
determination was that Weintraub had been "discharged for having an arrest record."
(Pl. Ex. 73).  On November 19, 1999, the Department of Labor amended the reason for
its determination, stating that "new information shows that [plaintiff was] discharged
for failure to notify [his] ex-employer . . . of [his] arrest which is a violation of Chancellor
Regulation C-105.  Although [Weintraub] stated that [he] did inform them about [his]
arrest, [he] refused to let this office to make copies of alleged proof showing [he]
informed [sic]." (Pl. Ex. 73).  On December 12, 1999 the Department of Labor withdrew

13

its determination pending further fact finding.  (Pl. Ex. 74).

After the criminal charges against Weintraub were dismissed, he informed Becker of the dismissal and requested reinstatement to teach. (Pl. Ex. 70).  Cioffi also became aware that the charges had been dismissed. (Pl. Ex. 63 at 37).  Nonetheless, Weintraub was not restored to his job at P.S. 85. (Pl. Ex. 67 at 75).

## PROCEDURAL HISTORY

In an earlier CPLR Article 78 state court proceeding, Weintraub sought review of the Board's dismissal of him, alleging that the termination was in bad faith and in retaliation for his having served upon the Board a notice of claim for false imprisonment related to his June, 1999 arrest.  (See Def. Ex. L).  In that proceeding, the state court held that Weintraub was "unable to generate any evidence that his termination was retaliatory for having served a notice of claim."  (Id. at 4).  Defendants argue that the adverse finding in the Article 78 proceeding collaterally estops plaintiff from litigating before this Court whether he was terminated in retaliation for serving the notice of claim.

> Under New York law, the doctrine of issue preclusion only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. Issue preclusion will apply only if it is quite clear that these requirements have been satisfied, lest a party be precluded from obtaining at least one full hearing on his or her claim.

Colon v. Coughlin, 58 F.3d 865, 870 (2d Cir.1995).

The issue presented in the Article 78 proceeding was narrowly framed. Weintraub sought review only of whether he was discharged in bad faith, or with improper reason, for filing a notice of claim that preserved his right to sue the Board for

false imprisonment.  No issues were raised related to the alleged First Amendment retaliation, false imprisonment or Fourth Amendment violations, or constitutional due process rights allegedly violated in the course of his termination.  Thus, preclusive effect is not given to the issue litigated in the Article 78 proceeding because the issue that was in question at the Article 78 proceeding is distinct from the issues presented to this court.

## DISCUSSION

### I.     Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

A moving party is entitled to judgment as a matter of law if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which he has the burden of proof.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The court, however, views all of the evidence presented in the light most favorable to the party against whom summary judgment is sought, and draws all reasonable inferences in his favor, in light of the "factual context" in which the claims arose.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine issue of material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Where a genuine

15

issue of material fact exists, summary judgment is inappropriate.

## II.    Plaintiff's Claims Under 42 U.S.C § 1983

To state a claim under § 1983, plaintiff must allege (1) a violation of his

constitutional rights (2) by a person acting under color of state law.  See Parratt v.

Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Dwares v. City of New

York, 985 F.2d 94, 98 (2d Cir.1993).

A party may be liable for the acts of those whom he supervises.  Though

"supervisor liability in a § 1983 action depends on a showing of some personal

responsibility, and cannot rest on respondeat superior," Richardson v. Goord, 347 F.3d

431, (2d Cir.2003), liability may be established by showing any of the following:

> (1) actual direct participation in the constitutional violation, (2) failure to
> remedy a wrong after being informed through a report or appeal, (3)
> creation of a policy or custom that sanctioned conduct amounting to a
> constitutional violation, or allowing such a policy or custom to continue,
> (4) grossly negligent supervision of subordinates who committed a
> violation, or (5) failure to act on information indicating that
> unconstitutional acts were occurring.

Hernandez v. Keane,  341 F.3d 137, 145 (2d Cir.2003).  See also Colon v. Coughlin, 58

F.3d 865, 873 (2d Cir.1995).

Similarly, the rule of respondeat superior does not apply to hold municipalities

liable in Section 1983 actions.  See Monell v. Department of Social Services of City of

New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978)  However, a municipality may

be held liable for relief where the "action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officers."  Id. at  690.  Even where the policy

"has not received formal approval through the body's official decisionmaking channels,"

a municipality may be liable when "execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . ." Id. at 691, 694 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)). An official's acts may fairly be said to represent official policy "where an official has final authority over significant matters involving the exercise of discretion." Rookard v. Health and Hospital Corp., 710 F.2d 41, 45 (1983). And a "single unlawful discharge," if ordered by such a person, "can, by itself, support a claim against a [municipality]." Id. See also Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 143 (2d Cir.1999) (holding that adverse retaliatory employment decisions made by administrators were the responsibility of the municipal corporation). Finally, where, as here, a plaintiff alleges a constitutional violation from a municipality's failure to train its employees, the failure to train employees provides a basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [personnel] come into contact." City of Canton v. Harris, 489 U.S. 378, 388, 390-91, 109 S.Ct. 1197 (1989).

### A.     First Amendment retaliatory action claim

Weintraub alleges that he suffered adverse employment action by Goodman, O'Gorman, Vazquez, and the Board for exercising his First Amendment rights. Because it is undisputed that Goodman, O'Gorman and Vazquez acted under color of state law for the purposes of this claim, the Court only discusses whether their acts may have constituted a First Amendment violation.

"The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights." Johnson v. Ganim, 342 F.3d 105, 112 (2d

17

Cir.2003) (citing <u>Hale v. Mann</u>, 219 F.3d 61, 70 (2d Cir.2000)).  And while the First

Amendment does not "require a public office to be run as a roundtable for employee

complaints over internal office affairs," <u>Connick v. Myers</u>, 461 U.S. 138, 149, 103 S.Ct.

1684, 1691 (1983), a "public employee who arranges to communicate privately with his

employer rather than to spread his views before the public" still enjoys the benefit of free

speech. <u>Givhan v. Western Line Consol. School Dist.</u>, 439 U.S. 410, 415-16 99 S.Ct. 693,

697 (1979).  The enterprise of the Court "is to arrive at a balance between the interests of

the teacher, as a citizen, in commenting upon matters of public concern and the interest

of the State, as an employer, in promoting the efficiency of the public services it

performs through its employees." <u>Pickering v. Board of Ed. of Tp. High School Dist.</u>

<u>205, Will County, Illinois</u>, 391 U.S. 563, 569, 88 S.Ct. 1731, 1735 (1968).

On a First Amendment employment retaliation claim, the employee bears the

initial burden of demonstrating that "(1) the speech at issue was made as a citizen on

matters of public concern rather than as an employee on matters of personal interest,

(2) he or she suffered an adverse employment action, and (3) the speech was at least a

substantial or motivating factor in the adverse employment action." <u>Morrison v.</u>

<u>Johnson</u>, 429 F.3d 48, 51 (2d Cir.2005) (per curium) (citations omitted).  Because

Weintraub was reassigned, transferred, and terminated, there is no doubt that he

suffered adverse employment actions.  As such, only the first and third prongs need be

discussed.

### 1.      Was Weintraub's speech protected by the First Amendment?

A public employee speaks as a citizen on a matter of public concern if the speech

"relat[es] to any matter of political, social, or other concern to the community." <u>Connick</u>

v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983).  Broadly stated, matters of public concern are matters that are the "subject of legitimate news interest; that is, [the] subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 83, 125 S.Ct. 521, 526, 160 L.Ed.2d 410 (2004).  Protection is afforded public employees when speaking on matters of public concern partly in consideration that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public."  Id. at 82.

Speech on matters of public concern is contrasted with speech on matters of interest solely to the employee, as to which the government, as an employer, has greater latitude to take action.  See Connick, 461 U.S. at 146, 147-48.  When an employee's comments are motivated not by some "altruistic" desire to improve the public service or protect the public, but rather strictly by personal emotions or interest, the First Amendment does not protect the employee from corresponding administrative action. Thus, for example, disruptive complaints from employees seeking to advance their personal stake, complaints about matters unconnected to public policy, and unprotected commercial speech are actionable by public employers.  See, e.g., Connick, 461 U.S. at 138 (desire for specific job assignment not matter of public concern); Hellstrom v. U.S. Dept. of Veterans Affairs, 46 Fed.Appx. 651, 656 (2d Cir.2002) (unpublished disposition) (questioning of director's competency in light of personnel disagreement was motivated by personal interests and anger, and not some desire to improve VA or protect the public); Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2d Cir.1993) (complaints of sexual harassment were personal in nature and did not implicate broader

policies of the hospital); White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1060 (2d Cir.1993) (speech regarding private commercial transactions not related to a matter of public concern); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775 (2d Cir.1991) (speech of medical resident identifying unsatisfactory programmatic conditions not a matter of public concern where they related to her own situation in the program).

The determination of which category into which particular speech falls "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-148.  This is a fact-intensive question to be decided as a matter of law by the Court.  See Morris v. Lindau,196 F.3d 102, 110 (2d Cir.1999) (citing Connick, 461 U.S. at 148 n.7).

There is no doubt that the content of Weintraub's statement to Goodman relates to a matter of public concern, namely  discipline in the public schools.  The topic is the subject of extensive public comment, policy debate, and persistent coverage in the media.  See, e.g., David M. Herszenhorn, His Leverage Secure, the Mayor Continues to Press Public Schools, N.Y. Times, Jan. 4, 2006, at B1 ("Behavior-problem kids are without a question the worst issue for teachers trying to teach lessons."); Betsy Gotbaum, Public Advocate, School Violence is a Crime Against our Children, Newsday, April 4, 2005, at A40; David M. Herszenhorn, Problems of School Discipline System Emerge at Hearing, N.Y. Times, Jan. 29, 2004, at B6; Susan Saulny, City Adapts a Police Strategy to Violent Schools, Oct. 19, 2004; Bryan Virasami, A Tougher Course / Mayor Announces Aggressive Plan on School Discipline, Newsday, Dec. 24, 2003, at A5.  It is a subject on which the media has specifically demonstrated an interest in the opinions

and perspectives of teachers.  See, e.g., Letter from former teacher Pamela Brown to the
N.Y. Times, Curbing Violence in City Schools, Jan. 7, 2004, at A20; Letter from New
York City Public School Teacher Wendy Holtzman to the N.Y. Times, Violence in the
Schools, Jan. 9, 2004, at A18.  Moreover, the specific issue of student violence against
teachers presents an issue of public concern in its own right.  See, e.g., David M.
Herszenhorn, Union Cites Growing Violence on Teachers, N.Y. Times, Oct. 10, 2003, at
B7; Letter from teacher Karen Leon to the N.Y. Times, Jan. 6, 2004, at A20 ("Is there a
benchmark for how serious an injury against a staff member must be before students are
removed?  It might be helpful for teachers to know how much physical harm they must
endure [before action is taken against a student].").  Thus, it cannot seriously be
contested that the content of speech questioning an administrative response, or lack
thereof, to discipline problems in the classroom relates to a matter of public concern,
regardless of whether that speech comes from a elected official, citizen, or teacher.

 The form and context of Weintraub's statements do not dissuade the Court from
finding Weintraub's speech related to a matter of public concern.  As noted in Givhan,
the fact that an employee chooses to express his concerns privately, as opposed to
publicly, does not mean that the speech is not motivated by public concern or
unprotected as free speech.  Givhan, 439 U.S. at 415-16.  The most that can be said about
the form and context of Weintraub's statements, however, is that he restrained himself
to direct, respectful, private communication with Goodman, and when he was
unsatisfied with the results of that complaint, he spoke with other teachers and lodged a
grievance through the appropriate established channels for remedying administrative
failures.

Moreover, there is no evidence that Weintraub was primarily motivated by a desire for some personal gain, or to obtain a benefit that he would enjoy exclusively, in speaking to Goodman.  To the contrary, Weintraub's undisputed testimony establishes that his primary motivation was a general concern for safety in the classroom and school.  While Weintraub would certainly have enjoyed a safer classroom and more appropriate teaching environment from the enforcement of disciplinary policy, these are not personal benefits in any traditional sense of the word.  Rather, they are a change in conditions that would benefit not only Weintraub, as a teacher, but all of the students in the classroom, and by extension the rest of the school and the community.

Considering the content, context, and form of Weintraub's speech, in light of all of the facts disclosed by the record, the Court finds that Weintraub's complaint to Goodman and subsequent grievance were protected by the First Amendment.

### 2.    Was Weintraub's speech a substantial or motivating factor in the adverse employment action?

The question of whether Weintraub's speech was a substantial or motivating factor in the adverse employment action is a question of fact generally left to a jury to resolve, as "without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations." Piesco v. City of New York, Dept. of Personnel, 933 F.2d 1149, 1155 (2d Cir.1991) (quoting Peacock v. Duval, 694 F.2d 644, 646 (9th Cir.1982) (quoting Mabey v. Reagan, 537 F.2d 1036, 1045 (9th Cir.1976))).  Nonetheless, to defeat a motion for summary judgment, plaintiff "may not rely on conclusory assertions of retaliatory motive, but must offer instead some tangible proof to

22

demonstrate that [his] version of what occurred was not imaginary." Morris v. Lindau, 196 F.3d at 111. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Id.

Weintraub faced increasingly serious charges, which were each successively determined unfounded, after speaking to Goodman about Goodman's failure to discipline the student. A jury could infer that Goodman initially intended to punish Weintraub for his speech with minimal retaliatory action, but when Weintraub was vindicated against each improper act, a more egregious action followed in furtherance of Goodman's improper motive. Similarly, O'Gorman was involved with many of the events, and supervised Goodman throughout the time period. A jury could find her either directly liable, or liable under a theory of supervisor liability for failure to act on Weintraub's complaints or gross negligence in her supervision of Goodman.

Vazquez and the Board are also implicated on the First Amendment retaliation claim, as a jury could infer that the retaliatory acts were the cause of Weintraub's dismissal, and that Vazquez either knew of the retaliatory motive, or was grossly negligent in his failure to investigate and act upon all of Weintraub's grievances. Similarly, because Vazquez was vested with the authority and discretion to terminate Weintraub, if he exercised his discretion in violation of plaintiff's constitutional rights, the Board could be held liable on a theory of municipal liability.

Because defendant has failed to establish an absence of undisputed material facts, the motion for summary judgment on the first claim must be denied.

**B.   Fourth Amendment false arrest and malicious prosecution claims**

Plaintiff asserts that O'Gorman, Goodman, Serrano, Miller and the Board caused him to be falsely arrested and maliciously prosecuted, and in so doing, deprived him of liberty and property in violation of the Constitution.  These claims allege a violation of the Fourth Amendment, which protects "the right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Cons. Am. IV.  See also Albright v. Oliver, 510 U.S. 266, 274, 114 S.Ct. 807, 813 (1994) (constitutional right at issue in § 1983 suit for false imprisonment and malicious prosecution is the Fourth Amendment right).

**1. The false arrest claim**

Under New York law, the elements of a false arrest or false imprisonment claim are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir.1995).  That the first three elements are established is not in dispute.

Miller contends he had probable cause to make the arrest, which would privilege the confinement.  See, e.g., Bernard v. United States, 25 F.3d 98, 102 (2d Cir.1994) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").  Plaintiff denies that Miller had probable cause, and suggests that at best, the existence of probable cause is a matter of factual dispute that must be resolved by the jury.

Under New York law, a police officer may arrest a person for "[a] crime when he

24

has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." N.Y. Crim. Proc. L. § 140.10.  The definition of "reasonable cause" is the equivalent of "probable cause" in the federal framework.  People v. Johnson, 66 N.Y. 2d 398, 402 n.2 (N.Y.1985).  The probable cause requirement is satisfied if the officer "received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth . . . The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." Miloslavsky v. AES Engineering Society, 808 F.Supp. 351, 355, aff'd 993 F.2d 1534 (2d Cir.1993) (internal citation omitted).  See also Caldarola v. Calabrese, 298 F.3d 156, 163 (2d Cir.2002) (citing Miloslavsky).

"Probable cause 'does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been . . . committed' by the person arrested."  People v. Shulman, ___ N.E.2d ___, 2005 WL 2759199 (N.Y.2005) (citing People v. Bigelow, 66 N.Y.2D 417, 423 (1985)).  "When determining whether the police had probable cause to arrest, the 'inquiry is not as to defendant's guilt but as to the sufficiency for arrest purposes of the grounds for the arresting officer's belief that [the defendant] was guilty.'" Shulman, 2005 WL 275 9199 (citing People v. Coffey, 12 N.Y.2D 443, 452 (1963); CPLR § 140.10(1)(b).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996).  However, where the question of whether probable cause existed or not is predominantly factual in nature, it is appropriately presented to a jury.  See, e.g., Moore v. Comesanas, 32 F.3d

25

670, 673 (2d Cir.1994) (whether or not probable cause existed properly presented to the jury when officer relied upon ambiguous warrant and conflicting accounts of the parties' behavior and statements at the scene of the arrest).

There is no significant factual dispute over the fact that Miller received his information from Serrano, the putative victim, who recounted the allegations before Goodman, O'Gorman, Miller, and an assembly of police officers.  Rather, plaintiff argues that because Serrano and Miller never directly addressed each other in dialogue, it was unreasonable for Miller to rely upon her recounting of the events in developing probable cause to arrest Weintraub.  Such a strict standard is not required by the law.  Cf. People v. Ketcham, 93 N.Y.2d 416, 420, 690 N.Y.S.2d 874, 877 (N.Y.1999) (probable cause may be based on hearsay upon demonstrating the reliability of the hearsay informant and the basis of the informant's knowledge).  Here, Miller's testimony is undisputed that though Serrano did not directly address him, she recounted her version of the events in his presence.  (See Def. Ex. F at 22).

Plaintiff also argues that the circumstances under which Miller received the information suggest that Serrano's veracity was in doubt, and that because those circumstances were suspicious, it was unreasonable for Miller to have found probable cause prior to making a more thorough investigation of the allegations.  Weintraub bases this argument both on the pattern of allegations defendants had made against him, Serrano's previous involvement in one of those allegations, and the fact that the allegations were later proved to be unfounded, spurious, or exaggerated.  On this point, Singer is instructive.  See Singer v. Fulton County Sheriff, 63 F.3d 110 (1995).

In Singer, where plaintiff sued for false arrest, a store employee had offered a

26

deposition to the arresting officer in which the employee "recounted that Singer presented him with a list of items he was taking and asked if he could come back later to pay for them; according to [the employee], he expressly told Singer it was not all right for [him] to take the food items from the store without paying." Id. at 119.  To contest probable cause, Singer offered evidence that his arrest was motivated by the employee's, officer's, and community officials' history of hostility to his political beliefs.  The Second Circuit held that the deposition provided probable cause, notwithstanding that the evidence established "circumstances of [the] arrest [that] raise[d] questions as to the motivation of the arresting officer, the village officials, and even the store employees . . . [M]otivation is not a consideration in assessing probable cause."  Id.

Here, the circumstances establishing probable cause are even less suspect than in Singer, because beyond plaintiff's speculation, there is no evidence that Miller knew of the deteriorated relationship between the parties or that Miller had an improper motive for making the arrest.  Moreover, the circumstances in which Miller learned of the event, hearing Serrano recount the allegations before an assembled group of authorities including law enforcement officials and her supervisors, would tend to bolster an officer's presumption that the alleged victim was telling the truth.  Were she not, she would be opening herself up to the legal liability alleged in this lawsuit, as well as, one might presume, disciplinary administrative action.

Because Miller was present when a putative victim recounted her personal recollection of the crime, and because an officer may generally presume a victim's reliability when she describes an offense, and moreover because this presumption was bolstered by the circumstances under which the victim spoke, the Court finds, in the

27

absence of any evidence that Miller acted with improper motivation, that Miller's arrest was privileged with probable cause.  Miller cannot be held liable for either a violation of plaintiff's rights under 42 U.S.C. § 1983, or for false arrest under state law.

O'Gorman, Goodman, and Serrano assert that they cannot be held liable for false arrest under state law or for violation of Weintraub's Fourth Amendment rights under § 1983.  They cite precedent that "[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution," and implicitly disclaiming that, as civilians, they acted under color of state law.  Du Chateau v. Metro-North Commuter R.R. Co, 253 A.D. 2d 128, 131, 688 N.Y.S.2d 12 (2d Dept.1999); See also Mestiti v. Wegman, 307 A.D.2d 339, 763 N.Y.S.2D 67 (2d Dept.2003); Schiffren v. Kramer, 225 A.D.2D 757, N.Y.S.2d 175 (2d Dept.1996).

While it is true that citizens who furnish information to the police in good faith will not generally be held liable for false arrest when the police exercise independent judgment to arrest a defendant, even if the defendant is ultimately found not guilty, the cases cited by defendants are distinguishable and inapplicable to the facts here.  In DuChateau, where DuChateau brought a civil suit after the conductor on a commuter train reported to police that he had assaulted her by grabbing her arm, neither the underlying facts nor the conductor's good faith account of the events were in dispute; and the police independently exercised their judgment to make an arrest.  The court explicitly distinguished that case from cases in which the civil defendant "commenced the proceeding against the plaintiff or . . . instigated the arrest." DuChateau, 253 A.D.2d

28

128 at 131.  Here, Weintraub complains that the defendants instigated the arrest, and did so based on facts that they knew were false.  Mestiti actually cuts against defendants' argument, as that opinion affirmed a jury verdict against the civil defendant for false arrest and false imprisonment where the defendant had "acted with undue zeal by affirmatively instigating the plaintiff's arrest."  Mestiti, 307 A.D.2d at 341.  And in Schiffren, where the plaintiff brought a false imprisonment claim against individuals who had allegedly contributed to his false arrest, the court granted summary judgment for one party, an attorney who provided information to police in response to an investigator's question, noting the attorney's "limited involvement" in the arrest and that it was unclear whether the defendant spoke with the police "prior to or after the plaintiff's arrest."  Schiffren, 225 A.D.2D at 758.  Here, Weintraub alleges defendants contacted the police in an effort to have him arrested.

Contrary to defendants' argument, even where there is no claim that a defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can "show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff."  Carrington v. City of New York, 201 A.D.2d 525, 527, 607 N.Y.S.2d 721 (2d Dept.1994).  Such an action will lie where the defendants "lacked reasonable cause for their belief in the plaintiff's culpability."  DeFilippo v. County of Nassau, 183 A.D.2d 695, 696-697, 583 N.Y.S.2d 283 (2d Dept.1992).  See also King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d Cir.1997).

The truth of what actually occurred on the sidewalk between Serrano and Weintraub is disputed.  If a jury were to believe Weintraub's account, rather than

Serrano's, it would reasonably infer that Serrano knew Weintraub had not assaulted her, but nonetheless intended to have him arrested by making false statements to the police. Moreover, given Serrano's role in supporting the prior exaggerated allegation of abandonment Goodman levied against Weintraub, Goodman and O'Gorman's pattern of filing unsubstantiated charges against Weintraub, and the fact that Serrano returned to the school and went to O'Gorman's office to report the alleged crime, rather than contacting the police directly, there is more than a modicum of evidence on which a jury could infer the intent of Goodman and O'Gorman to have Weintraub falsely arrested. Because there are factual disputes that, if resolved in Weintraub's favor, would warrant a finding that the defendants intentionally caused his false arrest, the Court denies summary judgment for Goodman, O'Gorman and Serrano on the Fifth Claim, for false imprisonment under state law.

Plaintiff also alleges that defendants, for their role in his arrest, violated 42 U.S.C. § 1983. There is no doubt that a false arrest constitutes a violation of an individual's Fourth Amendment constitutional rights, but plaintiff must also establish that defendants acted under color of state law. Private parties acting alone may not violate § 1983's state action requirement. See, e.g., Briscoe v. LaHue, 460 U.S. 325, 330; 103 S.Ct. 1108, 1113 (1983). However, when the alleged constitutional deprivation may be "fairly attributed" to the state, a private party may be held liable as a state actor under § 1983. The question of whether the deprivation may be fairly attributed to the state is not coterminous with the ultimate question of the liability of the state actor; rather, it is an analytical test to determine whether a private party acted under color of state law. See Coakley v. Jaffe, 49 F.Supp.2d 615, 624 (S.D.N.Y.1999) ("[p]rivate persons, jointly

engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983, even if the state actor himself is immune from liability.").

This Court finds applicable and persuasive the reasoning of a recent decision in this District, in which Judge Korman held that private parties may be liable for violation of § 1983 where they made false allegations to a city agency that resulted in a deprivation of plaintiff's constitutional rights.  See Friedman v. New York City Administration for Children's Services, et al, 2005 WL 2436219, *6 (E.D.N.Y.2005). Judge Korman began with  Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), in which the Supreme Court announced a "joint engagement" theory of liability for private party liability under § 1983:

> [A] private party . . . even though not an official of the State, can be liable under § 1983.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willing participant in joint activity with the State or its agents."

Id. at 152 (quoting United States v. Price, 383 U.S. at 794 (1966)).  Under this theory, corruptly conspiring with a state actor can subject a private party to liability.  See Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (action against private party who corruptly conspired with a judge).

The formal requirements of a conspiracy, however, are not required to fulfill the joint engagement theory.  The Supreme Court in Lugar v. Edmonson Oil Co., 457 U.S. 922, 941-42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), held that a corporate creditor and its president acted under color of state law to deprive plaintiff of constitutionally protected rights where they abused a Virginia statute authorizing prejudgment

attachment by obtaining an ex parte order that was later determined unfounded.  The criteria arising out of <u>Lugar</u> to determine whether a private party may be held liable for its acts in violation of § 1983, are first, "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority," and second, "whether, under the facts of [the] case, respondents, who are private parties, may be appropriately characterized as 'state actors.'" <u>Id.</u> at 939.

 With respect to the first criteria, the Virginia prejudgment attachment statute "required only that Edmonson allege, in an <u>ex parte</u> petition, a belief that Lugar was disposing of or might dispose of his property in order to defeat his creditors" for the writ to issue.  Thus, Edmonson's unfounded statements caused the Virginia court to issue the writ and the sheriff to attach plaintiff's property.  <u>Id.</u> at 924.  The Court observed that "[w]hile private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action.  This is subject to constitutional restraints and properly may be addressed in a § 1983 action, if the second element of the state-action requirement is met as well." <u>Id.</u> at 941.

 With respect to the second criterion, the Court repudiated the notion that "joint participation" must be concerted action.  The Court stated that the Court of Appeals "erred in holding that in this context 'joint participation' required something more than invoking the aid of state officials to take advantage of state-created attachment procedures . . . Whatever may be true in other contexts, this is sufficient when the State has created a system whereby state officials will attach property on the <u>ex parte</u> application of one party to a private dispute." <u>Id.</u> at 942.  This principle was implicitly

reestablished by <u>American Manufacturers Mutual Insurance Co. v. Sullivan</u>, 526 U.S. 40, 58 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).  There, the Court held that a private insurer's withholding of payments in accordance with Pennsylvania's Workers' Compensation Act did not constitute state action.  In clarifying the <u>Lugar</u> criteria for "joint participation," however, the Court noted that "[i]n the present case, of course, there is no effort by petitioners to seize the property of respondents by an <u>ex parte</u> application to a state official."

As noted by Judge Korman in <u>Friedman</u>, though "<u>Lugar</u> arose in the context of prejudgment attachments of property, there is a stronger basis for extending the holding of a case where a defendant deliberately and wrongfully caused a violation of the plaintiff's constitutional rights." <u>Friedman</u>, 2005 WL 2436219 at *7.  And indeed, though both <u>Lugar</u> and <u>Friedman</u> arose in the civil context, stronger still is the argument for applying <u>Lugar</u>'s reasoning where a criminal arrest and a person's physical liberty are at stake.  <u>See</u> <u>Coakley</u>, 49 F.Supp.2d 615 (S.D.N.Y.1999) (holding private actors liable under § 1983 where they manipulated evidence they presented to a county assistant district attorney leading to the arrest and prosecution of the plaintiffs.).  State law permits  a crime victim to rely upon a police officer's nearly unassailable right to find probable cause and make an arrest based upon a victim's allegations.  In return, the law does not demand accuracy in all of her allegations; it only demands that she not abuse the officer's authority to make the arrest.  If a victim makes false statements to the police, with the intent to have an innocent person arrested in violation of his Fourth Amendment rights, she may not only be held accountable for false imprisonment under state tort law, but under federal law, for invoking the state's power to intentionally

33

violate a citizen's constitutional rights.

Here, defendants claim entitlement to judgment as a matter of law because their roles in his arrest were "civilian" in nature.  Because defendants made <u>ex parte</u> statements to police that caused plaintiff's arrest, however, the classification of their role as civilian requires a preceding conclusion that they acted in good faith.  Because there are genuinely disputed facts over whether defendants intended by their actions to have plaintiff falsely arrested, this Court cannot determine that defendants Goodman, O'Gorman, and Serrano are entitled to judgment as a matter of law on plaintiff's Third Claim, alleging violation of his Fourth Amendment rights.

The Board, however, cannot be liable for the allegedly false arrest or for Fourth Amendment violations against Weintraub.  The theory advanced by Weintraub on these claims is that the Board's failure to train Goodman, O'Gorman, Miller and Serrano resulted in Weintraub's false arrest.  Whether the individual defendants in this case followed proper procedures or not, the record is undisputed that the Board has enacted policies and provided training to its employees on the subject of proper arrest procedures in the school.  Miller testified that he had been trained on such procedures, and Weintraub's own submissions establish that these policies and training procedures exist.  Because there is no evidence that the Board acted with deliberate indifference on the subject of proper arrest procedures, the Board is entitled to summary judgment on Weintraub's Third Claim.

### 2.    The malicious prosecution claim

Though related, the torts of false arrest or imprisonment and malicious prosecution protect individuals from different harms.  Whereas the tort of false

34

imprisonment "protects the personal interest of freedom from restraint of movement," the tort of malicious prosecution "protects the personal interest of freedom from unjustifiable litigation." Broughton v. State of New York, 37 N.Y.2d 451, 456-457 (N.Y.1975). Thus, the "sine qua non" of malicious prosecution is a prior judicial proceeding, generally a warrant for which an arrest issues. Id. at 457. The elements of the tort are (1) commencement or continuation of a criminal proceeding, (2) termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice. Id. (citing Prosser, Torts, 4th Ed. § 119). A claim for malicious prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" Silver v. Kuehbeck, Slip Copy, 2005 WL 2990642 (S.D.N.Y.2005) (citing Stile v. City of New York, 172 A.D.2d 743, 743, 569 N.Y.S.2d 129 (2d Dept.1991) (quoting Broughton, 37 N.Y.2d at 459)).

Because there was no prior judicial proceeding to Weintraub's arrest and defendants have established that Officer Miller had probable cause to make the arrest, plaintiff's malicious prosecution claim must fail. Summary judgment must be granted for defendants on this claim for malicious prosecution.

### C.   Fourteenth Amendment claims

In his Fourth Claim, plaintiff alleges that Goodman, O'Gorman, Vazquez, Becker, Cioffi, and the Board deprived him of property and liberty without due process of law. The inquiry to this claim begins with a determination "whether the challenged state action infringed a protected constitutional right which plaintiff had. If the interest [he] asserts is not of a constitutional dimension, i.e., not a protected property or liberty

35

interest, then [his] arguments must fail." Donato v. Plainview-Old Bethpage Cent. School Dist., 96 F.3d 623, 628-629 (2d Cir.1996).

While the Fourteenth Amendment protects property interests, it does not create them. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is well-established that under New York law "[t]he employment of a probationary or non-tenured teacher may be terminated at any time during the probationary period, and for any reason, without a hearing." Von Gizycki v. Levy, 771 N.Y.S.2d 174, 3 A.D.3d 572 (2d Dept. 2004) (citing N.Y. Educ. L. § 2509(1)(a)). Thus, there is no basis in New York law to find that Weintraub had a property interest in his probationary teaching position. Accord, Donato, 96 F.3d at 629. While it is true, as noted in Donato, that the Board does not enjoy carte blanche to terminate even a probationary teacher, and indeed, Von Gizycki provides for an arbitrary and capricious standard of review on premature terminations of a probationary teacher, "constraints on the Board's discretion do not create a property interest for plaintiff in [his] probationary position." Donato, 96 F.3d at 629-630. See also, Von Gizycki, 771 N.Y.S.2d 174. Any constitutional claim based on a deprivation of property in the form of a probationary teaching position must fail.

"A government employee's liberty interest is implicated where the government dismisses him based on charges 'that might seriously damage his standing and associations in his community' or that might impose 'on him a stigma or other disability

that foreclose[s] his freedom to take advantage of other employment opportunities.'" Brandt v. Board of Cooperative Educational Services, 820 F.2d 41 at 43 (citing Roth, 408 U.S. at 573). To succeed on such a "stigma-plus" claim, Weintraub must prove "1) some action by the Board imposing a tangible and material burden, and 2) utterance of a false statement that damaged his reputation in connection with the burdensome action." O'Connor v. Pierson, 426 F.3d 187, 195 (2d Cir.2005).

As applied to this case, Brandt is particularly instructive. There, a probationary teacher was pressured to resign by the school board under a cloud of allegations involving misconduct with his students. Brandt refused to resign, and sought relief pursuant to 42 U.S.C. § 1983 claiming that the allegations were false and that the school board had violated his right to liberty under the Fourteenth Amendment. The Circuit held that the teacher was entitled to a name clearing hearing after raising the issue of falsity regarding stigmatizing charges and statements in his personnel file, and that genuine issues of material fact existed as to whether those charges and statements would likely be made public. See Brandt, 820 F.2d at 41

Defendants' motion for summary judgment on plaintiff's "stigma-plus" claim must be denied. At various times, Goodman and O'Gorman inserted statements to Weintraub's personnel file alleging incompetent performance, abandonment of his class, corporal punishment, and sexual abuse. The falsity of each of these statements has been established or is alleged by Weintraub. Defendants Vazquez, Becker and Cioffi stated at various times that he was terminated for having been arrested for a serious offense, having had a criminal record, or for unsatisfactory performance as a teacher, and refused to reinstate him despite Weintraub's insistence that each of these

statements was false.  The falsity of each of these statements has either been established or is in dispute.

Moreover, some of the defendants have failed to comply when ordered to remove or redact inappropriate material from Weintraub's file.  For example, O'Gorman's first classroom observation was ordered removed and rewritten; instead, the offensive material was simply struck through with a series of thin lines that did not even render the statements unreadable.  It also appears that O'Gorman relied upon unsupported letters still in Weintraub's file, despite their having been found unsubstantiated, in completing the negative year-end performance review which was adopted by Vazquez. These acts cast doubt on whether Weintraub may rely on the future discretion of the defendants should he need to have his personnel files released to a prospective employer.  Arguably, Weintraub suffered an actual injury from defendants' failure to clear his name when he was terminated and not reinstated to his position in the Chancellor's District.  In any event, however, Weintraub "need not wait until he actually loses some job opportunities because the presence of the charges in his personnel file coupled with a likelihood of harmful disclosure already place him 'between the devil and the deep blue sea.'" Brandt, 820 F.2d at 45 (citing Velger v. Cawley, 525 F.2d 334, 336 (2d Cir.1975)).  He is entitled to remedial action to clear his name and insure that defendants do not unfairly interfere with his professional opportunities.

A name-clearing hearing is generally the appropriate remedy in a "stigma-plus" case.  See Brandt, 820 F.2d at 43 ("Where an employee's liberty interest is implicated, he is entitled under the due process clause to notice and an opportunity to be heard."). However, the Court will also entertain the possibility that in this case, where more than

five years have elapsed during which time plaintiff has been entitled to a name-clearing hearing, a name-clearing hearing may be insufficient and compensatory damages may also be an appropriate remedy.  See Patterson v. City of Utica, 370 F.3d 322, 337-338 (2d Cir.2004) (holding that where four years had elapsed during which an employee should have been entitled to a name-clearing hearing, a hearing would be an insufficient remedy and compensatory damages may be awarded).  Patterson established the precedent that where "it is unlikely that a proper name-clearing hearing would, at the present time, reverse any ill effects suffered by plaintiff from the inadequacy of the former hearing," a plaintiff may recover for damages that he can prove "he suffered as a result of the deprivation of his liberty interest [and] would not have occurred if [defendant] had provided [him] with a sufficient name-clearing hearing."  Id.

### CONCLUSION

Many questions of fact exist in this case that cannot be resolved by the Court. Specifically, though not exhaustively, factual determinations are needed with respect to defendants' intent on the First Amendment retaliation claim.  On the false arrest and Fourth Amendment claims, factual determinations must be made as to what took place between Serrano and Weintraub, and defendants' intent in having him arrested.  On the Fourteenth Amendment claim, facts remain to be established as to whether Weintraub was damaged by not having had an opportunity to clear his name, and the name-clearing hearing itself will require factual determinations.

For the foregoing reasons, summary judgment is DENIED for all defendants on plaintiff's First Cause of Action for First Amendment retaliation.  Plaintiff's Second

Cause of Action, inchoately alleging a violation of § 1983 arising from defendants' report of sexual abuse is DISMISSED for failure to state a claim.  Summary judgment is GRANTED for Frank Miller and the Board of Education on plaintiff's Third and Fifth Causes of Action, alleging Fourth Amendment violations and state law claims of false arrest, and for all defendants on the state law malicious prosecution claim.  Summary judgment is DENIED in all other respects on plaintiff's Third, Fourth, and Fifth Causes of Action alleging Fourth and Fourteenth Amendment violations under 42 U.S.C. § 1983 and false imprisonment under state law.


                                    SO ORDERED.

Dated:          Brooklyn, New York
                April 28, 2006.

                                    _____/s/_____

                                    I. Leo Glasser
                                    United States Senior District Judge


Copies of the foregoing memorandum and order were electronically sent to:

Counsel for the Plaintiff

Richard Engelberg
Kreines & Engelberg, Esqs.
email: frengel@optonline.com

Counsel for the Defendant

Pamela S. Richardson
New York City Law Department
Office of the Corporation Counsel
email: prichard@law.nyc.gov