UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------x

David WEINTRAUB

                Plaintiff,

    -against-

BOARD OF EDUCATION OF THE CITY
OF NEW YORK, COMMUNITY SCHOOL           MEMORANDUM AND ORDER
DISTRICT NO. 32, Lawrence BECKER,            00-CV-4384 (ILG)
Jerry CIOFFI, Dawn FELDER, Jamin
FELDER, Douglas GOODMAN, Daisy
O'GORMAN, Felix VAZQUEZ, Frank
MILLER, Aida SERRANO,

                Defendant,

--------------------------------------------------x

GLASSER, United States Senior District Judge:

      In this civil action alleging, <u>inter alia</u>, unconstitutional retaliation against the plaintiff, a former employee of the Board of Education of the City of New York, the City[1] has filed a motion seeking reconsideration of this Court's prior order denying summary judgment in favor of the defendants on the plaintiff's claim that the City violated his constitutional rights under color of state law, in violation of 42 U.S.C. § 1983 ("§ 1983"). For the reasons stated below, the City's motion is granted in part and denied in part.

**BACKGROUND**

      On April 28, 2006, this Court issued a Memorandum and Order granting in part and denying in part the City's motion for summary judgment. <u>See</u> <u>Weintraub v. Bd. of</u>

---

[1]     All of the individual defendants in this action are individuals employed by the public school system as teachers and administrators. All of the defendants are being represented by the New York City Office of Corporation Counsel. The Court shall therefore refer to the defendants collectively as the "City."

1

Ed. of the City of New York, 423 F. Supp. 2d 38 (E.D.N.Y. 2006) ("Weintraub I").[2]  In

summary of the portion of that opinion relevant to this motion, Mr. Weintraub alleges

that the conflicts giving rise to this action began on November 6, 1998, when he was

employed as a teacher at Public School 274 in Brooklyn, New York. On that date, Mr.

Weintraub sent a student in his class to the office of Douglas Goodman, the assistant

principal at PS 274, after the student threw a book at Mr. Weintraub.  Mr. Goodman

allegedly returned the student to Weintraub's classroom shortly thereafter.  On

November 9, 1998, the same student again threw a book at Weintraub, and Weintraub

once again sent the student to Goodman for discipline.  Goodman again instructed the

student to return to Weintraub's classroom shortly thereafter.  Dissatisfied with

Goodman's response, Mr. Weintraub approached Mr. Goodman privately and told him

that "[i]f nothing is going to be done about this, I will have to file a grievance because it

is not an environment a teacher would want to go to where a child is allowed to throw a

book at teachers."  Weintraub I, 423 F. Supp. 2d at 42.  Mr. Weintraub also discussed

the situation with other teachers at PS 247, and ultimately filed a grievance through his

union representative.  He alleges that these actions prompted an escalating series of

retaliatory steps by Mr. Goodman and other school officials, which began with

unfounded negative performance reviews and disciplinary reports that were placed in,

and ultimately removed from,[3] Mr. Weintraub's employee file,  and culminated with

---

[2]      Familiarity with the facts of this case and the issues of law discussed in Weintraub I is
herein presumed.

[3]      In one instance, Weintraub's superiors failed to comply with a grievance arbitrator's order
to delete substantial portions of an unfavorable observation report from Weintraub's file, instead drawing
thin lines through the portions of the report that the arbitrator found to be unfounded.  See Weintraub I,
423 F. Supp. 2d at 43-44.

false accusations of sexual abuse of a student, an arrest for misdemeanor attempted assault on allegedly false grounds, and Mr. Weintraub's ultimate termination.[4]

On July 28, 2000, Mr. Weintraub commenced this action, claiming, <u>inter alia</u>, that the retaliatory steps taken against him in retribution for his complaints about Mr. Goodman's handling of the disciplinary matter in November 1998 constitute an illegal infringement upon his First and Fourteenth Amendment rights, in violation of § 1983. In the portion of the prior order relevant to the present motion, the Court held that the plaintiff has stated a claim under § 1983, and that genuine issues of material fact precluded the entry of summary judgment for the City. Central to the Court's holding was its conclusion that Weintraub's speech was protected by the First Amendment under the standards set forth by the Supreme Court in <u>Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cty.</u>, 391 U.S. 563 (1968). In support of its conclusion that Weintraub's allegations satisfy the <u>Pickering</u> test, the Court determined that Weintraub's concerns about the lack of discipline and safety in New York City public schools, while clearly relevant to his personal interests, also pertained to a matter of public concern. On May 14, 2007, the City filed a motion requesting that the Court reconsider its earlier holding in light of the subsequent decision by the United States Supreme Court in <u>Garcetti v. Ceballos</u>, ___ U.S. ___, 126 S. Ct. 1951 (2006).

## DISCUSSION

### 1.   <u>The *Garcetti* Decision</u>

In support of its renewed motion to dismiss Weintraub's § 1983 claim, the City

---

[4]     See <u>Weintraub I</u>, 423 F. Supp. 2d at 42-48 for a detailed discussion of Mr. Weintraub's conflict with Mr. Goodman and the allegedly retaliatory steps taken against him.

argues that the Supreme Court's decision in <u>Garcetti</u>, issued approximately one month after <u>Weintraub I</u>, undermines this Court's determination that Weintraub has stated a valid claim of First Amendment retaliation under § 1983. In <u>Garcetti</u>, the respondent, Richard Ceballos, employed at the time as a calendar deputy[5] in the Los Angeles County District Attorney's Office, was contacted by a defense attorney who informed Ceballos that the affidavit used by law enforcement to obtain a search warrant that led to the arrest of the defense attorney's client contained "serious misrepresentations." <u>Id.</u> After conducting an independent investigation, Ceballos concluded that the search warrant had been improperly obtained, and submitted a "disposition memorandum" to his supervisors recommending that the prosecution be discontinued for that reason. <u>Id.</u> at 1955-56. His supervisors nevertheless decided to pursue the prosecution, at which point the defense attorney made a motion to traverse the search warrant and called Ceballos to testify at the hearing on that motion about his conclusions regarding the underlying affidavit. <u>Id.</u> at 1956. Ceballos alleged that, after this incident, he suffered several retaliatory employment actions, "includ[ing] reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion." <u>Id.</u> In response to these adverse actions, Ceballos filed an employee grievance, which was denied, and then commenced an action in the United States District Court for the Central District of California, alleging that his supervisors violated his First and Fourteenth amendment rights in retaliation for the statements made in his disposition memo. <u>Id.</u> The district court dismissed Ceballos's action, finding that his

---

[5] The <u>Garcetti</u> opinion does not elaborate on the role of a calendar deputy, except to note that the position involves "certain supervisory responsibilities over other lawyers." 126 S. Ct. at 1955.

memo was not protected speech because it was written pursuant to Ceballos's employment duties. Id. The Ninth Circuit reversed, holding that the memorandum satisfied the criteria set forth in Pickering, because the subject matter of Ceballos's memo "was 'inherently a matter of public concern,'" and because the defendants "'failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office' as a result of the memo." Garcetti, 126 S. Ct. at 1956-1957 (quoting Ceballos v. Garcetti, 361 F.3d 1168, 1173, 1180 (9th Cir. 2004)).

The Supreme Court reversed the Ninth Circuit's opinion, holding that because Ceballos "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case," but rather "acted as a government employee," the disposition memo was not protected by the First Amendment, and therefore could not form the basis of a First Amendment retaliation claim. Garcetti, 126 S. Ct. at 1960. Recognizing "the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance'" as underlying its previous opinions on the issue of First Amendment protection for state employee speech, the Court concluded that, although Ceballos's speech was relevant to a matter of public concern, it nevertheless failed to satisfy the first prong of the Pickering test, which, the Court explained, requires that the state employee be acting as a private citizen rather than as a public employee in order for First Amendment protection to attach. Id. at 1959 (quoting Connick v. Myers, 461 U.S. 138, 154 (1983)). In reaching its conclusion "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline," the

Court read a third element into the traditional _Pickering_ analysis, characterizing the _Pickering_ test as "first requir[ing] determining whether the employee spoke <u>as a citizen</u> on a matter of public concern," and, if so, "whether the relevant government entity had an adequate justification for treating the employee different from any other member of the general public." _Garcetti_, 126 S. Ct. at 1958 (citing _Pickering_, 391 U.S. at 568; _Connick_, 461 U.S. at 147) (emphasis added). The cited passage in _Pickering_ recognizes the "interests of the teacher, as a citizen, in commenting upon matters of public concern" as a justification for upholding a degree of First Amendment protection for workplace speech; prior to _Garcetti_, this language formed the basis of the principle applied by this Court in _Weintraub I_ that "[w]hen an employee's comments are motivated not by some 'altruistic' desire to improve the public service or protect the public, but rather strictly by personal emotions or interest, the First Amendment does not protect the employee from corresponding administrative action." 423 F. Supp. 2d at 51.[6] However, _Garcetti_ works an innovation upon the law by transmuting this principle, formerly a simple corollary to the proposition that a state employee's speech must concern a matter of public interest in order to enjoy First Amendment protection, into a new and independent element of a claim of First Amendment retaliation– that the

---

[6] Likewise, the Court's holding in <u>Connick</u> that "that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest. . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior" was not generally interpreted prior to <u>Garcetti</u> as suggesting that speaking "as a citizen" meant anything more than speaking upon a matter of public, as opposed to purely private, concern. 461 U.S. at 147. <u>See</u> <u>Public Employee Speech</u>, 120 Harv. L. Rev. 273, 278 (2006) ("[I]n both <u>Pickering</u> and <u>Connick</u>, the phrase 'as a citizen' operated not independently but rather as a marker present when employees spoke on issues of public concern. Yet <u>Garcetti</u> isolated the words 'as a citizen' and made them determinative: henceforth, public employees speaking 'pursuant to official duties' will not be speaking 'as citizens for First Amendment purposes.'" ).

public employee's speech was made in the employee's capacity as a private citizen rather than as an employee, a criterion that is never satisfied when the employee speech at issue was made pursuant to the employee's official duties. That is to say, "[w]hen a public employee speaks pursuant to employment responsibilities. . . there is no relevant analogue to speech by citizens who are not government employees." Garcetti, 126 S. Ct. at 1961.

## 2.    *Garcetti* Requires Reconsideration of *Weintraub I*

The Garcetti decision "profoundly alters how courts review First Amendment retaliation claims," and compels the Court to reconsider its earlier ruling that the speech underlying Weintraub's First Amendment retaliation claim is constitutionally protected. Casey v. West Las Vegas Indep. Sch. Dist., 473 F.3d 1323 (10th Cir. 2007). In Weintraub I, the Court recognized three categories of protected speech for which Weintraub could plausibly claim retaliation: (1) Weintraub's private conversation with Goodman in which he expressed his dissatisfaction with Goodman's handling of the book-throwing incidents and threatened to file a grievance if the situation was not rectified; (2) Weintraub's conversations with other teachers about the incidents and Goodman's failure to impose adequate discipline; and (3) the formal grievance itself. See Weintraub I, 423 F. Supp. 2d at 42. Under the Supreme Court's First Amendment doctrine as revised by Garcetti, the Court is compelled to conclude that the first and third of these categories are no longer viable bases for a First Amendment retaliation claim.

The City argues that Weintraub's claim is barred by Garcetti because all of the statements underlying that claim were made in his capacity as an employee, rather than as a citizen. In support of this view, the City observes that "[o]bviously, it is within the

job duties of any teacher to maintain discipline within his classroom, and Weintraub's referral of the student to Goodman. . . falls within these duties." Def. Br. at 4. The City also cites a portion of the "Agreement between the Board of Education of the City School District of the City of New York and United Federation of Teachers," which sets out the grievance and appeal procedure for disputes between teachers and school administration regarding student disciplinary matters. Id. Ex. C. In response, Weintraub points out that the City's argument incorrectly identifies the statements for which Weintraub alleges he suffered unconstitutional retaliation– Weintraub does not argue that his act of referring the student to Goodman is what prompted the escalating series of allegedly retaliatory actions; rather, he argues that his subsequent acts of complaining to Goodman about Goodman's handling of the situation, speaking to other teachers, and filing an official grievance prompted the unlawful retaliation. Weintraub's argument that the city misrepresents the actual basis of his First Amendment retaliation claim is correct, but does not alter the outcome of the City's motion in Weintraub's favor.

As noted above, Garcetti held that a public employee's speech is not protected by the First Amendment when speaking as an employee rather than as a citizen, and found the dispositive distinction between the two roles to be whether the speech was made pursuant to the employee's official duties or was not required by those duties.[7] This

_____

[7]    As the Garcetti court noted, neither the fact that a state employee's speech pertains to matters relevant to his official duties, nor the fact that it was made in private to his supervisor rather than in a public forum, is dispositive of the First Amendment inquiry. See Garcetti, 126 S. Ct. at 1959 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. . . . The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive."). Rather, the "controlling factor" in Garcetti was whether Ceballos's statements "were made pursuant to his duties as a calendar deputy." 126 S. Ct. at 1959-60.

interpretation is consistent with that of other federal courts applying <u>Garcetti</u> in similar circumstances, which have interpreted its language to mean that, if a public employee is compelled by his official duties to make the statement in question, the <u>Garcetti</u> rule excludes that statement from First Amendment protection, and the employer may retaliate against the employee on the basis of that speech without violating the employee's First Amendment rights. The Tenth Circuit's decision in <u>Casey</u> offers a concise illustration of the distinction between speech as an employee and speech as a citizen. In that case, the plaintiff was appointed Superintendent of the West Las Vegas Independent School District (the "District") in New Mexico by the West Las Vegas School Board (the "Board") in January 2002.  In this capacity, she also served as the Chief Executive Officer ("CEO") of the District's Head Start program, "a federally funded initiative aimed at providing educational opportunities, meals, and health care services to low-income children between three and five years of age."  <u>Casey</u>, 473 F.3d at 1325. Approximately one year later, Ms. Casey became aware that "as many as 50% of the families enrolled in the District's Head Start program appeared to have incomes that were too high for them to qualify for participation" in that program.  <u>Id.</u> at 1326.  She informed the president and other members of the Board about the possible fraud on several occasions between January and April 2003, but "was variously told not to worry about it, to leave it alone, or not to go there."  <u>Id.</u>  Unsatisfied with these responses, Ms. Casey instructed her assistant to notify the regional Head Start office in Dallas of her suspicions.  This notification led to an investigation by the United States Department of Health and Human Services, which concluded that "certain enrollments in the District's Head Start program were indeed improper and ordered the repayment of more than half

a million dollars in federal aid." Id.  During approximately the same time period, Ms. Casey became concerned that the Board "was violating the New Mexico Open Meetings Act by making personnel and other decisions in executive session without proper notice and meeting agendas." Id.  Ms. Casey informed the Board of her concerns, and when it took no action in response, she filed a written complaint with the New Mexico Attorney General, who commenced an investigation that ultimately concluded that the Board's practices were in violation of the Open Meetings Act, and ordered corrective action. Finally, also during approximately the same time period, Ms. Casey "brought to the Board's attention a number of other issues. . . that, she believed, violated federal or state laws," including deficiencies in the Board's hiring process and its handling of a situation in which a principal and teacher were having an affair.  Id.  On May 8, 2003, the Board voted not to renew Ms. Casey's contract as Superintendent, and to demote her to the position of Assistant Superintendent.  Ms. Casey then filed an action against the District and certain individual defendants, "alleging, inter alia, that she was dismissed in retaliation for exercising her First Amendment rights."  Id.  The District moved for summary judgment on the First Amendment retaliation claim based on qualified immunity, which the district court denied.  While the District's interlocutory appeal of the qualified immunity issue was pending, the Supreme Court issued its Garcetti opinion, and the Tenth Circuit requested additional briefing from the parties to address the impact of Garcetti on Ms. Casey's First Amendment retaliation claim.

The appellate court identified "three specific sets of communications that Ms. Casey cites as the bases for her First Amendment retaliation claims, those regarding (i) the Head Start Program, (ii) the New Mexico Open Meetings Act, and (iii) miscellaneous

10

other violations of state or federal law. . . ." <u>Id.</u> at 1329. Ms. Casey conceded, and the appellate court agreed, that the third category of communications, comprised of Ms. Casey's statements to the Board regarding miscellaneous violations of federal and state law in its routine operations, was clearly unprotected speech under the <u>Garcetti</u> rule because "these statements fell within the scope of her duties as Superintendent because they were aimed solely to the School Board to which she reported and her job admittedly included advis[ing] Defendants about the lawful and proper way to conduct school business." <u>Id.</u> (quotation marks and citation omitted, alteration in original). With respect to the first category of communications— Ms. Casey's statements regarding fraud in the Head Start program— the court divided those communications into two sub-categories: statements directed to Board members, and Ms. Casey's direction to her assistant to notify the regional Head Start office of the possible fraud. As to the first class of Head Start statements, the court held that these were unprotected speech under <u>Garcetti</u> because "these comments were directed only to her supervisors and. . . Ms. Casey sought to raise concerns about the legality of the District's operations." Because Ms. Casey admitted that advising the Board with respect to the legality of its conduct was a part of her responsibilities as Superintendent, the court "conclude[d] that Ms. Casey made these statements pursuant to her official duties." <u>Id.</u> The the second sub-category of Head Start communications— Ms. Casey's instruction to her assistant to notify the regional office of the irregularities despite the School Board's instructions to remain silent about the matter— required a lengthier analysis. The court noted that Ms. Casey's duties as CEO of the District's Head Start program "included acting pursuant to, or in compliance with, certain federal regulations" that required, <u>inter alia</u>, that Head

Start participants meet "specific income eligibility requirements," and that federal law imposed civil and criminal liability on a person in Ms. Casey's position who was aware of financial misstatements in the District's Head Start reports but failed to inform the appropriate federal authorities. Id. at 1330 (citing 45 C.F.R. § 1305.10 (2002)). The court further noted that Ms. Casey regarded the matter as sufficiently related to her employment duties that she deemed it appropriate to delegate the responsibility to her assistant, and that her assistant evidently did not object that Ms. Casey was acting outside the scope of her official authority. In light of these facts, the court concluded that Ms. Casey's conduct with respect to the Head Start reporting suggested "an individual striving diligently to fulfill a federal regulatory obligation directly bearing on her by virtue of the office she held." Id. at 1331. Though recognizing that Ms. Casey's actions concerned a matter of "great public import," the court nevertheless concluded that her communications with the regional office were not constitutionally protected because her speech in that situation was "more akin to a that of a senior executive acting pursuant to official duties than to that of an ordinary citizen speaking on his or her own time." Id. Finally, addressing the second category– Ms. Casey's statements regarding the Open Meetings Act– the court again divided her statements into two categories: her direct statements to Board members about her concerns, and the complaint she filed with the New Mexico Attorney General. With respect to the first sub-category, the court followed the same analysis that it had with the other categories, concluding that Ms. Casey's speech was not constitutionally protected because her statements "were made solely to her superiors and Ms. Casey, as Superintendent, had a duty to provide candid advice and counsel to the Board, much as any corporate CEO might to his or her board

of directors." Id. at 1332. The court concluded, however, that the second sub-category, Ms. Casey's complaint to the Attorney General, was "another kettle of fish," and was entitled to First Amendment protection. Id. The court found that, in filing her complaint with the state, Ms. Casey was not acting pursuant to her duty to advise the Board of its legal obligations, but "[j]ust the opposite: she had lost faith that the Board would listen to her advice so she took her grievance elsewhere." Id. It distinguished Ms. Casey's action in notifying an external agency, the Office of the Attorney General, about the School Board's violations of state law from her actions regarding the Head Start program, in which she also notified an external governmental agency of illegal activity in the District, on the ground that, "very much unlike the. . . Head Start program that the Board committed to her care and pursuant to which she had independent responsibilities to the federal government, we have no evidence in the summary judgment record. . . that the Board. . . ever assigned Ms. Casey responsibility for the Board's meeting practices." Id. After concluding that Ms. Casey's statements to the Attorney General satisfied the other elements of the Pickering test, the court held that "even after Garcetti, a claim based on these statements remains legally viable," because they involved illegalities that Ms. Casey "had no apparent duty to cure or report and which were not subject to her control." Id. at 1334. The Tenth Circuit thus remanded the case to the district court with instructions to proceed on the First Amendment retaliation claim based only on Ms. Casey's statements to the Attorney General.

Another appellate decision addressing the application of Garcetti to circumstances similar to those presented here is Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), in which the Ninth Circuit partially upheld a jury verdict on a First Amendment

retaliation claim brought by a former California prison guard against her former supervisors, in which the plaintiff alleged that her supervisors had taken a number of adverse actions against her, including commencing several Internal Affairs investigations, temporarily relieving her of duty, and ultimately terminating her employment, in retaliation for the plaintiff's actions in reporting sexually hostile and harassing actions routinely performed by inmates in the Pelican Bay State Prison's Secure Housing Unit against the plaintiff and other female guards. Specifically, the Freitag court identified six categories of speech that the district court had instructed the jury were protected by the First Amendment:

> (a) Reporting sexually hostile inmate conduct to agents of the California Department of Corrections, either formally or informally;
> (b) Documenting Pelican Bay State Prison's responses or failures to respond to Plaintiff's reports of sexually hostile inmate conduct;
> (c) Informing Cal Terhune, Director of the California Department of Corrections, of either the inmates' sexually hostile conduct or of Pelican Bay State Prison's responses or failures to respond;
> (d) Informing State Senator Richard Polanco either of sexually hostile conduct or of the Pelican Bay State Prison's responses or failures to respond;
> (e) Reporting either sexually hostile conduct or Pelican Bay State Prison's responses or failures to respond to the Office of the Inspector General; or
> (f) Cooperation with the investigation conducted by the Office of the Inspector General.

468 F.3d at 544. The court held that categories (a) and (b) were "clear[ly]. . . not constitutionally protected," because the plaintiff was under a duty pursuant to her employment as a prison guard to document inmates' sexually hostile behavior and the prison's response, but further held that items (d) through (f)– i.e., the plaintiff's contact with Senator Polanco and the Office of the Inspector General about the inmate situation and the prison's failure to adequately respond– were protected under the First Amendment because the plaintiff was acting in her capacity as a citizen rather than as a

state employee in those communications.[8] Id. (emphasis in original). The court

supported its conclusion that the plaintiff was speaking as a citizen in examples (d)

through (f) with the observation that "[i]t was certainly not part of her official tasks to

complain to the Senator or the IG about the state's failure to perform its duties properly,

and specifically its failure to take corrective action to eliminate sexual harassment in its

workplace," and remanded the case to the district court to determine, inter alia, whether

the court's instruction to the jury that categories (a) and (b) were protected speech was

harmless error. Id. at 545.

The general principle running through these and other cases applying Garcetti to

similar situations is that, when a public employee airs a complaint or grievance, or

expresses concern about misconduct, to his or her immediate supervisor or pursuant to

a clear duty to report imposed by law or employer policy, he or she is speaking as an

employee and not as a citizen; in such cases, the First Amendment does not protect the

employee's speech from discipline or retaliation by the employer.[9] In such

circumstances, the employer is free to "discipline" the employee without violating the

---

[8] The Freitag court held that an unresolved issue of fact existed with respect to category (c), because the court was "unsure whether prison guards are expected to air complaints regarding the conditions in their prisons all the way up to the Director of the CDCR at the state capitol in Sacramento." Id. at 546.

[9] See, e.g., Mills v. City of Evansville, 452 F.3d 646, 647-48 (7th Cir. 2006) (Easterbrook, J.) (Police sergeant who approached Police Chief, Deputy Chief, and Assistant Chief on departmental premises to express criticisms of Police Chief's new plan of personnel allocation "spoke in her capacity as a public employee contributing to the formation and execution of official policy," and her speech was therefore not protected); Spiegla v. Hull, 481 F.3d 961 (7th Cir. 2007) (prison gate guard was "was speaking pursuant to her official duties– not as a citizen" when she raised concerns with her supervisor about apparent breach in security protocol).

employee's First Amendment rights.[10]  Garcetti, 126 S. Ct. at 1958.  If, however, the

employee goes outside of the established institutional channels in order to express a

complaint or concern, the employee is speaking as a citizen, and the speech is protected

by the First Amendment.  Applying this principle to the situation presented in this case,

it is clear that Weintraub's actions in speaking privately with Goodman to express his

concerns about classroom safety and filing the formal grievance are not protected

speech under the Garcetti Court's interpretation of the First Amendment.  In both

instances, Weintraub was speaking as an employee, proceeding through official

channels to complain about unsatisfactory working conditions.  Under Garcetti, the fact

that Weintraub's speech also touched upon a matter of public concern is not sufficient to

entitle that speech to First Amendment protection.  Weintraub's conversations with

other teachers about his conflict with Goodman, however, are clearly not within the

scope of his employment duties.  He had no official duty to discuss the matter with his

colleagues, nor did he do so as part of a formal dispute-resolution process put into place

---

[10]     Garcetti draws no distinction between good-faith employer discipline based on an
employee's incompetent or insubordinate conduct, which the government in its capacity as employer
would presumably have been free to punish even under the unaltered Pickering test, and bad-faith
retaliation based on an employee's "blowing the whistle" on internal misconduct or other facts that cause
public embarrassment to the employer.  The Garcetti rule clearly encompasses the latter category of
employee speech when made pursuant to an employee's job duties, though such speech would have been
protected under the old Pickering rule.

Like other courts that have applied Garcetti in similar circumstances, this Court is "is gravely troubled by
the effect of Garcetti" upon situations such as this one, in which a public employee is deprived of a federal
constitutional remedy for his employer's alleged bad-faith retaliation for statements that were neither
incompetent nor insubordinate, but rather identified legitimate issues regarding the safe and effective
operation of the public school system.  Williams v. Riley, No. 2:05CV83-P-B, 2007 WL 763825 (N.D. Miss.
March 9 2007); see also Spiegla, 481 F.3d at (vacating jury verdict in plaintiff's favor pursuant to Garcetti,
"but not without our observation that the record and the jury's verdict substantiate that Spiegla was
punished for simply trying to follow the rules.").  Though it questions the wisdom of a constitutional policy
that disincentivizes public employees from bringing serious misconduct and abuse to the attention of their
superiors, while perversely encouraging them to take every internal conflict to the highest levels of
governmental oversight, this Court must nevertheless apply the Garcetti rule in good faith until the
Supreme Court sees fit to revisit the issue.

by his employer. Thus, when speaking to his co-workers about his concerns regarding school safety and Goodman's handling of the book-throwing incidents, Weintraub was speaking as a citizen rather than as an employee. While the extent to which any of the allegedly retaliatory actions taken by the City are directly traceable to Weintraub's conversations with other teachers, as opposed to his confrontation with Goodman and his formal grievance, is unclear, Weintraub is not barred by <u>Garcetti</u> from presenting his § 1983 claim, based solely on retaliation with respect to his private conversations with his colleagues, to the jury.

Weintraub argues that his First Amendment retaliation claim survives <u>Garcetti</u> in its entirety, but cites only one case, <u>Sassi v. Lou-Gould</u>, No. 05-CV-10450, 2007 WL 635579 (S.D.N.Y. Feb. 27, 2007), for that proposition. <u>Sassi</u> is easily distinguishable from the situation presented here. In <u>Sassi</u>, the plaintiff, a police officer in Beacon, New York, filed an action against the City of Beacon, alleging, <u>inter alia</u>, that the City had taken certain adverse employment actions against him in retaliation for critical statements regarding police department funding and morale made by the plaintiff's father, the Beacon Chief of Police, in several letters to the City Council.[11] The court, noting that Chief Sassi's letters to the City Council specifically stated that he was writing in his capacity as a "'resident taxpayer' of the City of Beacon," rejected the City's argument that the letters were written pursuant to Chief Sassi's official duties, and were therefore unprotected speech under <u>Garcetti</u>. <u>Id.</u> at *2. The court reasoned that "[u]nlike the plaintiff is [sic] <u>Garcetti</u>, whose job it was to write the communications

---

[11]     The <u>Sassi</u> court held that the plaintiff had standing to sue for retaliation on the basis of statements made by his father. <u>See id.</u> at *2 n. 4.

which he claimed constituted protected speech, Chief Sassi had no such duty to write public letters to the City Council 'as a resident taxpayer,'" and concluded that Chief Sassi was therefore speaking as a citizen, rather than as a public employee, in his letters.  Id. at *3.  Concluding that the plaintiff had satisfied all of the other elements of First Amendment retaliation, the court granted summary judgment in his favor on his § 1983 claim.

Weintraub's situation is clearly distinguishable from Sassi.  Unlike Chief Sassi, who voluntarily wrote in his capacity as a private citizen about general problems in the police department to an external governmental organization, Weintraub's conversation with Goodman and his formal grievance were purely internal communications pursuant to an established dispute-resolution policy for the governmental agency by which he was employed.  Chief Sassi's letter is analogous to Officer Frietag's communications with Senator Polanco and the Office of the Inspector General that the Ninth Circuit held to be protected speech in Freitag, whereas Weintraub's speech is analogous to the disposition memorandum that ADA Ceballos submitted to his direct superiors, pursuant to his official duties as a calendar deputy.   Sassi therefore does not provide a basis upon which to distinguish Weintraub's situation from the weight of authority holding that public employees who convey complaints or grievances about a matter pertaining to their official duties to their supervisors do so in their capacities as employees rather than citizens, even when the subject matter of their speech touches upon a matter of public concern, and that such speech is not protected by the First Amendment.

It is therefore clear that the Supreme Court's decision in Garcetti precludes Weintraub's § 1983 claim, to the extent that that claim is based on Weintraub's private

conversation with Goodman and his formal grievance.[12]  To the extent, however, that Weintraub claims the City retaliated against him for his conversations with other teachers regarding the facts underlying his grievance, he may present that claim to the jury.

### 3.    Plaintiff Shall be Permitted to Pursue an Interlocutory Appeal

28 U.S.C. § 1292(b) provides that, "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."  The Court believes that those criteria are satisfied here.  The question of how a district court is to distinguish which acts of a public employee are performed pursuant to an employment duty has been addressed by the Second Circuit only in one brief, unpublished opinion.  See DeFilippo v. New York State Unified Court Sys., No. 06-1561-CV, 2007 WL 1174135 (2d Cir. April 19, 2007).[13]  In DeFilippo, the Second

---

[12]    Mr. Weintraub also argues that Garcetti is not dispositive of his § 1983 claim because the Garcetti majority rejected Justice Souter's argument in dissent that its opinion "may have important ramifications for academic freedom, at least as a constitutional value," 126 S. Ct. at 1962 (citing 126 S. Ct. at 1969-1970 (Souter, J., dissenting)) on the ground that "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."  Id. at 1962.  This argument is frivolous; it is clear from the context of the Court's statement that its reference to "teaching" refers to the substance of academic expression, not to the enforcement of disciplinary procedures in a public classroom.  The conflicts between Weintraub and the defendants at issue here have nothing to do with the infringement of Weintraub's "academic freedom," as that term is understood in First Amendment jurisprudence.

[13]    Aside from DiFilippo, the Second Circuit has cited Garcetti in only six other cases.  See Reuland v. Hynes, 460 F.3d 409 (2d Cir. 2006); Zelnik v. Fashion Inst. of Tech., 464 F.3d 217 (2d Cir. 2006); Skehan v. Vill. of Mamaroneck, 465 F.3d 96 (2d Cir. 2006); Paola v. Spada, 204 Fed.Appx. 946 (2d Cir. 2006); McGuire v. Warren, 207 Fed.Appx. 34 (2d Cir. 2006); Morris-Hayes v. Bd. of Educ. of Chester Union Free City Sch., 211 Fed.Appx. 28 (2d Cir. 2007).  None of those opinions involve any substantial analysis of the effects of Garcetti on the application of the First Amendment to public employee speech.

Circuit summarily affirmed an order of Judge Garaufis of this District granting summary judgment in favor of the defendant where the plaintiff conceded in a deposition that the Unusual Occurrence Report underlying the plaintiff's First Amendment retaliation claim was prepared pursuant to his duties as a court officer. The Second Circuit has not yet addressed the precise issue presented here: whether a public employee acts as an "employee," and not as a "citizen," when he notifies his supervisors, either formally or informally, of an issue regarding the safety of his workplace that touches upon a matter of public concern, as well as on the employee's own private interests. While the Court believes that the weight of authority among the federal courts that have applied <u>Garcetti</u> in similar circumstances supports the view that Weintraub's conversation with Goodman and his formal grievance are unprotected speech, a substantial ground for difference of opinion may exist on that point, because the appellate court might reasonably disagree with the Court's holding on the ground that, while Weintraub's act of sending the book-throwing student to Goodman for discipline was clearly required by his official duties, his duties as a teacher did not <u>require</u> him to take any further steps such as approaching Goodman about the situation or commencing a dispute-resolution proceeding. The supererogatory nature of those subsequent actions may prove sufficient to sustain the view that Weintraub was not acting pursuant to any duty when he performed those actions, and that his speech was therefore protected. Alternatively, the court could reasonably conclude that Weintraub's conversations with other teachers was sufficiently related to his employment duties that those conversations are also unprotected speech under <u>Garcetti</u>. Finally, appellate review of this question at this point in the proceedings may advance the ultimate

termination of this litigation, which has been pending for nearly seven years. If the action were to proceed to trial before Weintraub could appeal the Court's ruling, he would be precluded from presenting the bulk of his First Amendment retaliation claim to the jury. If the Second Circuit were to subsequently conclude on appeal that Weintraub's speech was protected, the case would need to be retried, resulting in a substantial waste of resources on the part of the Court and the parties to this action. The Court therefore encourages Weintraub to file an interlocutory appeal of this order, and respectfully requests the Second Circuit to exercise its discretion under § 1292 to review this order prior to trial. If the Second Circuit chooses to do so, this action shall be stayed until the appellate court has resolved the issues presented in Weintraub's appeal. 28 U.S.C. § 1292(b) ("[A]pplication for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.").

**4.      The Parties Motions In Limine are Denied as Unripe**

In anticipation of the trial of this case that was to commence on May 29, 2007, both parties have submitted motions in limine challenging the admissibility of various proposed exhibits. Because trial must now be postponed indefinitely pending appeal of this order, and because the outcome of that appeal may affect the evidence that both sides intend to introduce at trial, the motions in limine are hereby denied as not yet ripe for adjudication, without prejudice and with leave to renew when the trial of this case is rescheduled.

## **CONCLUSION**

For the foregoing reasons, the City's motion to reconsider this Court's order denying summary judgment as to Weintraub's § 1983 claim for First Amendment retaliation is GRANTED. On reconsideration, the City's motion for summary judgment as to the § 1983 claim is GRANTED in part and DENIED in part. The parties' motions in limine regarding the admissibility of various proposed exhibits are hereby DENIED, with leave to renew those motions when the trial is rescheduled.

SO ORDERED.

Dated:     Brooklyn, New York
           May 29, 2006

_____/s/_____

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:


<u>Counsel for the Plaintiff</u>

Richard Engelberg
Kreines & Engelberg, Esqs.
330 Old Country Road
Mineola, NY 11501

Gary N. Weintraub
Caputi, Weintraub & Neary
50 Elm Street
Huntington, NY 11743

<u>Counsel for the Defendants</u>

James Lemonedes
NYC Office of Corporation Counsel
Law Department
100 Church Street - Rm 2-172
New York, NY 10007

Robert James Anderson
Office of the Corporation Counsel
City of New York
100 Church Street
New York, NY 10007